CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 11 2011

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# LYNCHBURG DIVISION

| | |
|---|---|
| LISA CECIL, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 6:10cv00009 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) By: Hon. Michael F. Urbanski |
| Commissioner of Social Security, | ) United States Magistrate Judge |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Lisa Cecil ("Cecil") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under the Social Security Act (the "Act"). On appeal, Cecil contends that the Administrative Law Judge ("ALJ") should have given controlling weight to the opinion of her treating physician, Dr. Swartz, and that the ALJ failed to properly evaluate her credibility. Cecil also argues that the ALJ relied on flawed testimony from the Vocational Expert ("VE"), Coretta Harrison. Having carefully reviewed the administrative record and considered the arguments of counsel, the undersigned concludes that the ALJ properly considered the medical evidence and assessed Cecil's credibility. Careful review of the VE's testimony, however, requires remand of this case for further administrative consideration. As such, it is **RECOMMENDED** that the Commissioner's motion for summary judgment (Docket #15) be **DENIED,** that plaintiff's motion for summary judgment (Docket #13) be **GRANTED,** and that this case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further vocational assessment.

I

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

3

## II

Cecil was born in 1975, (Administrative Record, hereinafter "R." 22, 28), and is considered a "younger individual" under the Act. 20 C.F.R. §§ 404.1563(b), 416.963(b). She graduated from high school (R. 28) and previously worked as a telephone operator, a telephone assembler, a hand packer, a fast food worker, and a home health aide. (R. 21.) Cecil filed applications for DIB and SSI on April 25, 2007, alleging disability as of March 26, 2007 based on scoliosis and two bulging discs in her back. (R. 12, 156.) Her applications for benefits were rejected by the Commissioner initially based on a medical records review by Robert Pyle, M.D. (physical) and Steven Salmony, Ph.D. (mental). (R. 236-43, 249-65.) This decision was confirmed on reconsideration based on medical records reviews by Robert Gardner, M.D. (physical) and W.W. Albertson, Ed.D. (mental). (R. 282-89, 290.) An administrative hearing was convened before an ALJ on June 4, 2009, at which Cecil was represented by counsel. (R. 24-47.)

In a decision dated August 5, 2009, the ALJ found that Cecil's scoliosis, disorder of the lumbar spine without nerve compression, arthritis, bursitis, allergic rhinitis, headaches and anxiety/adjustment disorder that does not require treatment, all qualify as severe impairments pursuant to 20 C.F.R. §§ 404.1520(c), 416.920(c). (R. 14.) The ALJ determined that Cecil has the RFC to perform a range of light work, including lifting/carrying up to twenty pounds occasionally and ten pounds frequently, and standing, walking, and sitting each for a total of 6 hours in an 8-hour workday, provided that she has a sit/stand option that allows her to change position at will and as often as need for comfort. (R. 18.) The ALJ also found Cecil could only occasionally push and pull with her lower extremities; climb stairs and ramps; stoop, bend, kneel, crouch or crawl; but could never climb ladders, ropes or scaffolds. (R. 18.) The ALJ also

determined that Cecil should engage in no more twisting than required in the course of daily living, and that she must avoid exposure to workplace hazards and lung irritants. (R. 18.) To account for her non-exertional limitations, the ALJ found that she is limited to the performance of unskilled work consisting of non-complex, routine, repetitive tasks in a low stress environment that does not involve work at a production rate. (R. 18.) While Cecil is unable to perform her past relevant work, the VE testified at the administrative hearing that there are a significant number of jobs in the national economy that Cecil can perform, such as dispatcher, ticket seller, and protective clothing issuer. Thus, the ALJ held that Cecil is not disabled under the Act. (R. 23.) The Appeals Council denied Cecil's request for review and this appeal followed. (R. 1-3.)

### III

Plaintiff first argues on appeal that the ALJ did not give the appropriate weight to the opinion of her treating physiatrist, Dr. Swartz. Dr. Swartz noted on November 6, 2007 that: "Mrs. Cecil is unable to perform work of any kind due to ongoing pain and postural abnormalities related to her thoracolumbar scoliosis. I expect her to maintain this status for at least a year." (R. 291.) Dr. Swartz also opined as to Cecil's functional limitations in a Multiple Impairment Questionnaire dated January 14, 2008. In this questionnaire, Dr. Swartz stated Cecil could sit for 3-4 hours and stand/walk no more than one hour in an eight hour day. (R. 294.) He further stated that she could not sit, stand or walk continuously and had to get up and move around every 30-45 minutes; that she could only occasionally lift 5-10 pounds; that she is significantly limited in her ability to reach, handle, finger; and that she had moderate limitations in her ability to reach overhead and grasp or twist objects. (R. 294-96.) He also stated she would need to avoid heights, pushing, pulling, kneeling, bending or stooping. (R. 298.) When

5

asked about the onset of these limitations, he responded, "5+ years / I'm really unsure to be honest." (R. 298.)

A treating physician's opinion is to be given controlling weight by the ALJ if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations...."); Social Security Ruling ("SSR") 96-2p.

In determining the weight to give to a medical source's opinion, the ALJ must consider a number of factors, including whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d), 416.927(d). A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide his reasons for giving a treating physician's opinion certain weight or explain why he discounted a physician's opinion. Mastro, 270 F.3d at 178; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give to your treating source's opinion.").

The ALJ considered Dr. Swartz's opinions as to Cecil's ability to work and gave them some – but not controlling – weight. Because Dr. Swartz's opinions were rendered a short time after treatment began, and because treatment records do not support his opinions as to Cecil's functional limitations, substantial evidence supports the ALJ's decision in this regard.

Dr. Swartz's first opinion as to Cecil's functional capacity, that she was unable to work for at least a year, was set forth in the form of a note written on a prescription pad a mere seven days after he first examined her on October 30, 2007. Treatment notes from that initial visit do not provide any support for his conclusion that Cecil is completely disabled from all work.[2] Rather, notes reveal Cecil was in no acute distress and had fair coordination, normal reflexes and sensation, and 5/5 motor function in all extremities. (R. 305.) Dr. Swartz stated Cecil's gait slightly favored the right, and she had mild rightwards rotation of the thoracic spine, mild elevation of the right scapula, tenderness in the trapezius muscles and generalized tenderness in the left side, which appeared to be muscular in nature. (R. 305.) Her scoliosis was apparent. He diagnosed Cecil with idiopathic thoracolumbar scoliosis and compensatory myofascial pain, predominantly involving the trapezius muscles, and a three right rib-tip syndrome. (R. 305.) Dr. Swartz recommended conservative treatment, including physical therapy, trigger point injections, a TENS unit, deep tissue massage, pain medication, and anti-inflammatories. (R. 305.) Nothing in these records from her initial visit to Dr. Swartz indicates that Cecil is disabled from all work. Thus, Dr. Swartz's November 6, 2007 prescription pad note is not entitled to controlling weight. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Nor is Dr. Swartz's January 2008 RFC assessment entitled to controlling weight. At the time he filled out this Multiple Impairment Questionnaire, Dr. Swartz had treated Cecil only

---

[2] A statement by a medical source that an individual is disabled is an opinion on an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e).

7

three times. Records from these visits show Cecil was in no acute distress, and had normal sensation and normal range of motion in her extremities. (R. 300, 302, 305.) Cecil had muscle tenderness and increased pain with extension of the back; Dr. Swartz diagnosed her with scoliosis, myofascial pain and lumbar facet disease. (R. 300.) Cecil's treatment remained conservative, and she reported improvement in her symptoms. Dr. Swartz encouraged flexion and leg range of motion exercises and told her to continue her therapy and medications. (R. 300.)

The severe limitations set forth in the Multiple Impairment Questionnaire are simply not supported by the treatment records. Three months after filling out this questionnaire, in March 2008, Dr. Swartz noted he hoped to increase Cecil's physical activity and improve her core muscle strengthening and posture. (R. 335.) Cecil did not seek treatment for back pain for nine months after that, until she presented to Dr. Swartz on December 19, 2008.[3] At the time, she was working part time as a cashier 15 hours per week, although she continued to complain of pain. (R. 332.) Examination revealed Cecil was in no acute distress and stood without any obvious tenderness, but she had some discomfort with flexion, extension and lateral bending. (R. 332.) Dr. Swartz noted physical therapy would be a "key" element of her treatment and he continued her on pain medication and anti-inflammatories. (R. 332.) Of note, Dr. Swartz stated he would "restrict her work to sedentary duty, essentially" (R. 333), which is inconsistent with his November 6, 2007 statement that Cecil is unable to perform any work. Her status as of January 2009 remained essentially the same, with the exception of increased anxiety resulting from the fact that her house burned down and she was forced to move. (R. 330.) Dr. Swartz continued to recommend therapy and prescribe medication pain, as well as for anxiety.

---

[3] The December 19, 2008 treatment notes indicate that Cecil had not followed up with Dr. Swartz because she had moved and lacked transportation. (R. 332.)

While Dr. Swartz stated in the questionnaire that he based his RFC findings on a December 26, 2007 MRI, he noted the study showed multi-level facet arthrosis and only mild disk disease in the lumbar spine.[4] These findings do not support the significant limitations set forth in the Multiple Impairment Questionnaire. (R. 293.) Nor do the other diagnostic studies in the record. An x-ray and MRI taken in January 2006 reveal prominent scoliosis but otherwise mild findings, with no neural foraminal narrowing or nerve compression. (R. 222, 225, 228.) The record indicates Cecil has been treated conservatively, and doctors have consistently recommended physical therapy over surgery. (See R. 267.) Hans Hansen, M.D., a pain management specialist who twice performed lumbar facet interventions on Cecil stated on February 19, 2008, "I do not plan another intervention. She is a young vital member of society. I would like her to consider some type of vocational retraining. I do not want to see her go down the pathway of prolonged disability." (R. 336.)

The ALJ carefully considered Dr. Swartz's opinions regarding Cecil's functional limitations and incorporated into the RFC those findings that were supported by the medical evidence of record. For example, the ALJ incorporated a sit/stand option that would allow Cecil to change positions at will and as often as needed for comfort. (R. 18.) The ALJ also took into account the fact that plaintiff's pain would interfere with her attention and concentration, restricting her to unskilled work consisting of non-complex, routine and repetitive tasks in a low stress environment that does not require work at a production rate. (R. 18.) The ALJ also incorporated Cecil's postural limitations into the RFC, finding she could not climb ladders, ropes or scaffolds; only occasionally climb stairs and ramps; occasionally stoop, bend, kneel, crouch or crawl; and not twist more than required in the course of daily living. (R. 18.)

---

[4] The MRI results are not part of the administrative record.

9

This RFC assessment is consistent with the findings of the consultative examiners, Dr. Rosenbloom (physical) and Dr. Lucas (mental), and the reviewing state agency physicians. Dr. Rosenbloom noted Cecil had full range of motion in her cervical spine but decreased range of motion in the thoracolumbar spine in all directions, secondary to moderate to severe scoliosis. (R. 231.) He also stated that she had full range of motion in her shoulders, elbows, wrists, hands, fingers, hips, knees and ankles, and she had 5/5 strength in her hand grasp. (R. 231.) Her gait was normal; she could raise her hands over her head and manipulate small objects with both hands; her coordination, sensation, and reflexes were normal; and straight leg raising was negative bilaterally. (R. 231.) She could not stand on her heels and squatted and rose with great difficulty. (R. 231.) Dr. Rosenbloom concluded that Cecil's severe scoliosis affected her ability to sit, stand, move about, lift, carry and travel, but that she had no problem with handling light objects, hearing and speaking. (R. 231.)

Dr. Lucas noted during her psychological consultation that Cecil is "able to understand, retain and follow instructions. She is able to sustain attention and perform simple, routine, repetitive tasks that is [sic] limited only by her reported scoliosis condition. She has a good ability relating with others and could likely handle supervision without difficulty. There is no psychological evidence to indicate that she would have any more difficulties than anyone else tolerating the stress and pressures associated with day-to-day work activity." (R. 246.)

Finally, the ALJ's RFC determination is consistent with the assessment made by reviewing physician, Robert Gardner, M.D., who stated that Cecil could lift and carry 20 pounds

occasionally and 10 pounds frequently, was limited in her ability to push and pull with her lower extremities, and had some postural limitations.[5] (R. 283-84.)

The ALJ carefully considered the opinions of Dr. Swartz and gave them some weight. The decision not to give Dr. Swartz's opinions controlling weight is supported by substantial evidence, given the short duration of Dr. Swartz's treatment, the conservative nature of his treatment, and the lack of objective findings to support the degree of limitation set forth by Dr. Swartz. This aspect of the Commissioner's decision is supported by substantial evidence.

## IV

Cecil also argues that the ALJ erred by failing to properly evaluate her credibility as to the extent of her pain and functional limitations. In light of conflicting evidence in the record, it is the duty of the ALJ to fact-find and to resolve any inconsistencies between a claimant's alleged symptoms and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Accordingly, the ALJ is not required to accept Cecil's subjective allegation that she is disabled by pain, but rather must determine, through an examination of the objective medical record, whether she has proven an underlying impairment that could reasonably be expected to produce the symptoms alleged. Craig v. Chater, 76 F.3d 585, 592-93 (4th Cir. 1996) (stating the objective medical evidence must corroborate not just pain, or some pain, or pain of some kind or severity, but the pain the claimant alleges she suffers.). Then, the ALJ must determine whether Cecil's statements about her symptoms are credible in light of the entire record. Credibility determinations are in the province of the ALJ, and courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989).

---

[5] The other reviewing state agency physician, Robert N. Pyle, M.D., determined that Cecil was much less restricted by her impairments, finding she could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds with unlimited pushing and pulling with no other postural limitations. (R. 237.)

11

The ALJ correctly determined that Cecil's medically determinable impairments, including her scoliosis, could reasonably be expected to produce her pain. However, the ALJ found that Cecil's statements as to the limiting effects of this pain are not credible to the extent they are inconsistent with the RFC determination. (R. 19.) The evidence of record supports this determination. Cecil testified that she can sit for only 20 to 30 minutes before needing to get up, and that she cannot sit still or in the same position. (R. 33.) But her disability application reveals that she sat through the entire 70 minute interview without moving or shifting or showing signs of pain. (R. 153.) This is consistent with the ALJ's observation that Cecil sat through the entire administrative hearing in no apparent discomfort (R. 19), as well as reflections in the treatment records that she appeared to be in no pain or distress (see, e.g., R. 300, 302, 305, 321), she moved around the exam room well (R. 267), and she was able to get on and off the exam table without difficulty. (R. 223.)

She reported to Dr. Lucas during the consultative examination that she takes her dog for a walk each day, does chores, does laundry, cooks, cleans and grocery shops for the household as necessary. (R. 245.) She testified that she is able to do the dishes, wipe off the table, dress herself, make the bed, and take the stairs into her house. (R. 38, 39.) She helps her son with homework and attends school conferences. (R. 40.) She testified that her pain is minimized with medication. (R. 35.) Cecil was encouraged by her physical therapist to increase her activity level and time out of bed, and she was noted to be taking her son to football practice and games four times per week. (R. 271, 272.) Cecil last worked in March, 2007 as a customer service representative in a call center. Although she testified that she "let the job go" due to back problems (R. 29), she reported to Dr. Lucas during her consultative examination that she was

fired for forgetting to "ask about woman's last name on the phone and it was being monitored." (R. 245.)

For these reasons, the undersigned finds no reason to disturb the ALJ's credibility assessment. The ALJ carefully considered the medical evidence and accounted for Cecil's pain and impairments in finding she could perform a limited range of light work. As the ALJ noted:

> [The RFC determination] accounts for the claimant's scoliosis, disorder of the lumbar spine, arthritis and bursitis by limiting her to the reduced range of light work activity above, subject to the identified postural limitations, sit/stand option, and the environmental limitation that she avoid workplace hazards. This assessment of the claimant's residual functional capacity accounts for her allergic rhinitis with the environmental limitation that she avoid exposure to allergens, pollutants, fumes, dust and other lung irritants. In addition, it accounts for both the claimant's anxiety-related disorder and her pain by limiting her to unskilled work activity in a low stress environment.

(R. 21.) This aspect of the Commissioner's decision is supported by substantial evidence.

V

Finally, plaintiff argues that the ALJ relied on flawed testimony from the VE in concluding there are jobs in the national economy that Cecil can perform. Specifically, Cecil claims that the VE's testimony is unreliable because she did not understand that for a claimant to be found capable of performing a job, such work must be performed on a full-time basis. (Pl.'s Br. 22.) The current state of the administrative record leaves some question as to what the VE was saying in response to the cross-examination by Cecil's counsel. Because of the lack of clarity in the VE's testimony and the fact that the Commissioner bears the burden at step five of the sequential evaluation process, the undersigned believes that this case needs to be remanded for a complete understanding of the vocational evidence provided by the VE.

13

The ALJ posed a hypothetical to the VE identifying an individual who could perform a limited range of light work with a sit/stand option.[6] In response, the VE properly identified three jobs in the national economy that plaintiff could perform – dispatcher, ticket seller, and clerical protective clothing issuer. When asked whether any jobs would be available if the ALJ found Cecil to be credible as to the degree of her limitations, the VE initially answered "yes." But when the ALJ restated the question, the VE corrected her answer:

> Q: If I found her testimony to be fully credible, would there be jobs?
>
> A: No, Your Honor.

(R. 45.) It appears the VE misunderstood the question the first time it was asked, as her initial affirmative answer was inconsistent with her previous response to the ALJ's hypothetical. She corrected her answer upon restatement of the question. Thus, there was no error here.

Cecil next argues that the VE's responses to abbreviated cross-examination demonstrates that the VE lacks understanding of what is required for full time work, calling into question the VE's entire testimony. First, Cecil argues that the following exchange demonstrates that the VE does not understand that a work day requires eight, as opposed to four, hours work.

> ATTY: Would any of those jobs remain if the claimant were limited to sitting a total of three hours in an eight-hour work day and standing or walking less than one hour?
>
> VE: Yes. Those types of jobs would provide for that kind of accommodation.
>
> ATTY: Isn't that less than eight hours though?

---

[6] The transcript of the administrative hearing states the following as part of the ALJ's hypothetical: "No sit/stand option, allowing a change in position at will." (R. 43-44.) This is clearly a typographical error. It is plain from the context that the ALJ included a sit/stand option in her hypothetical. The VE understood the hypothetical to include a sit/stand option, stating in her response, "While the Dictionary of Occupational Titles does not define sit or stand options, in the way that these jobs are performed in the national economy and from my experience in placing people in these types of jobs, an employee [sic] would provide a table that's waist high on [sic] a chair for the individual to be able to change position with these types of jobs throughout the day." (R. 44.)

14

> VE: Yes, but they would still accommodate those types of necessities.

(R. 45.) Cecil argues that the responses to those two questions suggest that the VE believed Cecil could work full time based on only four hours a day. On the one hand, such a construction is consistent with the literal wording of the question posed, as it refers to a limitation of "sitting a **total** of three hours in an eight-hour work day and standing or walking less than one hour." (R. 45, emphasis added.) On the other hand, Cecil's argument makes little sense in light of the VE's earlier testimony that Cecil could perform the three jobs identified with a sit-stand option. In this regard, the VE's testimony should be read to mean that Cecil can perform these three jobs on a full time basis (eight hours a day), even if she could sit no more than three hours and stand or walk less than one hour at any given time.[7]

It is equally difficult to understand the rather cryptic testimony on page 46 of the record. There, the VE testified as follows:

> ALJ: Are you saying, let me interrupt, are you saying that such an individual couldn't sustain concentration and attention for more than an hour?
>
> ATTY: For more than a full hour.
>
> ALJ: I think you can answer that.
>
> VE: Yes. If it's anything less than two and a half hours out of an eight hour day, if an individual would be compromised and not be able to work on a fulltime basis.

(R. 46.) From this, Cecil argues that the VE believes that an individual need only concentrate for two and a half hours out of an eight hour day to perform full time work. Given the terse

---

[7] It is not helpful to the court in considering this issue that the ALJ at the hearing did not attempt to clarify this testimony. Nor was the issue addressed in the ALJ's decision. The Commissioner's brief did not address this specific point either.

15

record, it is impossible to discern what this testimony by the VE was meant to convey. Again, both the ALJ's decision and the Commissioner's brief are silent as to this testimony. A reviewing court ought not be placed in a position requiring guesswork as to what the VE meant by her testimony.

As such, the undersigned is constrained to **RECOMMEND** that this case be **REMANDED** to the Commissioner for clarification of the vocational evidence.

## VI

The Clerk is directed to transmit the record in this case to the Honorable Norman K. Moon, Senior United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

Entered: May 11, 2011

Michael F. Urbanski
United States Magistrate Judge